Filed 8/18/23  In re L.C. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re L.C. et al., Persons Coming Under the Juvenile Court Law. | B325965 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PRISCILLA G. et al.,<br><br>Defendants and Appellants;<br><br>D.C. et al.,<br><br>Interveners and Respondents. | (Los Angeles County Super. Ct. No. DK05400B–C) |

APPEALS from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Vincent W. Davis for Defendant and Appellant Priscilla G.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant Jonathan C.

Dawn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

Christine Johnson, under appointment by the Court of Appeal, for Intervenors and Respondents.

## *INTRODUCTION*

Priscilla G. (mother) and Jonathan C. (father) appeal from the juvenile court's orders terminating their parental rights to their children.  They argue they were denied meaningful visitation with the children, which made it impossible for them to prove the parental-benefit exception to adoption set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1]  We affirm.

## *BACKGROUND*

The family in this case consists of mother, father, L.C. (daughter), and N.C. (son).

### 1.    *Prior Dependency Proceedings*

In 2014, the Los Angeles County Department of Children and Family Services (Department) filed section 300 petitions against mother and father on behalf of daughter, then two years old, and son, a newborn, alleging issues related to substance

---

[1]    All undesignated statutory references are to the Welfare and Institutions Code.

2

abuse and domestic violence. Both children were eventually placed with the paternal grandfather, D.C., and paternal step-grandmother, S.I. In 2016, following an unsuccessful reunification period, paternal grandparents were declared the children's legal guardians.

In 2017, father filed a section 388 petition asking the court to re-open reunification services. After a hearing, the court found father's circumstances were changing but had not changed, and he had not demonstrated that granting the request would be in the children's best interests. The court denied the petition, and jurisdiction remained terminated under guardianship.

In March 2020, mother and father each filed a petition under section 388 asking the court to re-open reunification services. The court denied both petitions, finding they did not state sufficient new evidence or change of circumstances; the court suggested the parents resubmit the petitions with reports and certificates from service providers and letters from therapists with knowledge of the case issues and the extent to which those issues had been addressed or resolved. Those petitions are not the subject of the present appeal.

In November 2020, the parents again petitioned the court to re-open reunification services under section 388. This time, the petitions included documentation. Father provided a certificate of completion of a residential drug treatment program, a progress report from his substance abuse counselor verifying attendance and compliance with drug testing, and evidence of steady employment and release from probation. Mother submitted evidence that she had completed a drug/alcohol program and aftercare program, anger management classes, and

parenting classes, and was receiving individual therapy and medication.

The Department recommended denying the parents' petitions. It acknowledged the parents had made "much progress," but opined that the "children view their Guardians as their parents and unfortunately, the years away from their parents has left them without an established parent/child bond . . . and the children do not want to live with the parents." It noted the legal guardians "have not helped to support the parent/child relationship for reasons that are assessed as protective and also as a result of some animosity. . . ."

## 2. *Reinstatement of Reunification Services*

On May 4, 2021, the court held that circumstances had changed sufficiently to warrant reinstatement of reunification services and it would be in the children's best interests to do so. The Department was ordered to provide the parents with low-cost referrals to recommended programs, to include on-demand drug testing. Visits, which were to be monitored by the Department, were to occur a minimum of once per week for at least two hours. The Department did not seek appellate review of the reinstatement order.

On August 4, 2021, mother's attorney submitted a walk-on request for the Department to prepare a report on visitation issues and for the court to admonish the legal guardians not to interfere with the parents' reunification services. Counsel stated the children were refusing to get into the Department's vehicle for visits, and the guardians were unwilling to transport them. Accordingly, the parents had not had a visit with the children for five weeks. Attached to the request was a letter from the family's therapist, who offered his "current and professional opinion that

4

the legal guardians are doing all they can to impede the reunification process between the children and their biological parents."

At the hearing on the request, the juvenile court ordered the legal guardians to transport the children to visits and directed the Department to facilitate family counseling between the parents and legal guardians. A progress hearing was scheduled for three weeks' later.

In the meantime, two monitored visits were scheduled between the parents and children; both were unsuccessful. At the first visit, the children refused to exit the guardians' car. At the social worker's urging, the paternal step-grandmother physically removed son from the car, but he ran around the vehicle and got back in. At one point, the children ran around the car, got in, and locked it. The children continued that behavior for 30 minutes, then began to argue with each other and physically hurt themselves. The parents tried to coax the children out, but their requests were ignored. The social worker ended the visit.

The guardians later reported that son had soiled his pants. Mother and father believed the children were acting this way because too much time had passed since their last visit; they had not seen the children in more than nine weeks. The Department acknowledged the nine-week absence was due to the Department's many failed attempts to transport the children to visits, combined with the guardians' refusal to transport them on the Department's behalf.

The second visit was scheduled for a week later. The social worker and children's therapist were both present. Although the guardians drove the children to the visit, the children argued and

refused to leave the car. Whenever the social worker or the parents tried to talk to them through the car windows, the children would close the windows and lock the doors. Again, the social worker ended the visit after 30 minutes because the children were getting aggressive and hurting each other. After the visit, the guardians reported that son appeared fearful and was having trouble sleeping. Daughter had become defiant and irritable and was having trouble concentrating.

On September 8, 2021, the court held a progress hearing on the visitation issue. Neither parent objected that there had been a lack of meaningful visitation. Children's counsel requested another follow-up hearing, which the court denied in light of the pre-permanency hearing scheduled for November.

Although initially scheduled for November, the pre-permanency hearing was repeatedly trailed to allow time for an Evidence Code section 730 evaluation. The effect of these delays was that the reunification period was extended, and the parents appeared in court in November 2021, December 2021, January 2022, and February 2022. At no point during these hearings did the parents argue that they had not been afforded meaningful visitation with the children.

### 3.     *Termination of Reunification Services*

The juvenile court began the February 25, 2022 pre-permanency hearing by noting it had been impressed "with how far the parents have come, how hard they've worked, the incredible progress they've made, and [it] was really hoping that . . . the children would be able to see that. But up until this point, they don't seem to be willing to recognize that." It also commended the legal guardians for "having really made an effort, as well. They've been participating in family counseling with the

parents, and at times have tried to encourage the children to participate in the visits. We don't have information that the guardians have done anything to poison the situation." The court heard argument from counsel and trailed the matter to March 1, 2022, for its ruling. Neither parent objected that there had been a lack of meaningful visitation.

At the March 2022 hearing, the court held that although the parents had proven changed circumstances, neither continuing reunification services nor returning the children to parents would be in the children's best interests. (See *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1086–1087 [the "burden of proof to modify a permanent placement plan is by a preponderance of the evidence to prove both changed circumstances and that the best interest of the child would be a change in placement to the parent's home"].) The court terminated reunification services and set the matter for a permanency planning hearing under section 366.26. The court also ordered continued visitation and therapy for the children, with participation in family therapy with the parents and legal guardians upon recommendation of the children's therapists.

Mother and father filed notices of intent to file a writ petition.[2] After appointed counsel filed letters pursuant to *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, indicating they were unable to file petitions on the merits, mother and father each filed a self-represented petition. Their principal argument was that the legal guardians had obstructed their

---

[2]     On our own motion, we take judicial notice of our docket and opinion in case No. B319064. (Evid. Code, §§ 459, subd. (a), 452, subd. (d)(1).)

7

reunification efforts; they also attached documents showing the progress they had made in reunification. We invited counsel for the parents to file supplemental petitions if they believed additional briefing was warranted in light of the issues raised in the petitions personally filed by mother and father. Neither attorney filed a supplemental petition. By contrast, children's counsel, the Department, and the legal guardians all opposed the petitions.

We stayed the section 366.26 hearing, issued an order to show cause, then denied the petitions by unpublished opinion. (*P.G. et al. v. Los Angeles Superior Court* (Sep. 1, 2022, B319064) [nonpub. opn.] (*P.G.*).) We held: "In light of the anxiety and distress experienced by the children at the prospect of reunification and increased contact with the parents, . . . the juvenile court reasonably found that continued reunification efforts would not be in the children's best interests. As the juvenile court recognized in making its decision, the parents were compliant with their case plan and had made 'incredible progress' in their lives. At the post-permanency stage, however, the cornerstone of the juvenile court's analysis is the children's best interests and not the parents' progress." (*Id*. at pp. 12–13.)

We continued: "The record also supports the juvenile court's statement that legal guardians 'hav[e] really made an effort' and have not 'done anything to poison the situation.' Although there is evidence legal guardians resisted visitation for a time for fear of Covid exposure, the record also shows they drove the children to visits, encouraged the children to get out of the car and interact with the parents and, on at least one occasion, even physically picked up [son] and set him down outside the car. Legal guardians also participated in family

8

counseling with the parents. The record demonstrates that, ultimately, it was the parents' lack of bond with the children, and the children's exceptionally strong bond with legal guardians, that hampered the parents' reunification efforts." (*P.G.*, *supra*, B319064, at p. 13.)

## 4.    *Termination of Parental Rights*

While the writ petitions were pending before this court, the parents continued to visit with the children, but the quality of those visits improved only sporadically, and even then, only at the margins. By this point, son was eight years old and daughter was turning 10. Typically, the guardians transported the children to a park in Pasadena. Usually, the children refused to get out of the car and spoke to the parents through the window. Sometimes, the parents were able to coax them out of the car with toys; other times, the children refused to speak at all. Most visits lasted about 30 minutes, but some went longer if the children were playing and seemed engaged.

Although the parents continued not to object about the nature of the visits, the court encouraged the guardians to exit the car during visits and to leave the windows rolled down if the children chose to stay in the car. The children resisted even this small change.

Son began to lose his appetite after these visits and said, "I didn't sign up for this" when referring to them. During one encounter, son said his parents were not mother and father; his actual parents—namely, the legal guardians—were in the car with him. When the parents said goodbye at the end of the visit, son responded, "bye losers." Son referred to another visit as "torture." Before a subsequent visit, the social worker heard son screaming in the car. In a similar vein, daughter explained, "l

9

don't like them.  I don't know why they say they love me if I don't love them."

The Department twice recommended the court terminate visitation because of the harm to the children, but the court denied the requests.  Still, the weekly interactions remained challenging.  The children did not want to participate, got discouraged when they had to go, regressed throughout the encounters, and became defiant after them.  They were consistently, adamantly opposed to visitation.

The court ultimately terminated parental rights on December 9, 2022.  The court considered the entire court file and heard testimony from the parents as well as closing argument from counsel.

Mother's attorney asked the court to apply the sibling exception and the parental-benefit exception to adoption.[3] Counsel emphasized that mother had visited the children regularly and consistently to the extent allowed by the court.  He did not object that visitation had not been meaningful.  As to the detriment prong, counsel acknowledged that "this is a difficult one, especially given the children's recent behaviors at visitations."  He conceded that "in the short term, I don't think the children will necessarily feel the immediate impact of the termination of parental rights and the severing of that relationship.  I think it's in the long run, in the long term, that

---

[3]  Mother's older son—the children's half-brother—had been involved earlier in the proceedings.  The half-brother had been placed with a foster parent, who later became his legal guardian; he never resided with son and daughter.  Parents do not pursue the sibling exception on appeal.

the children are going to understand the gravity of everything that has occurred." At that point, "years from now," termination of parental rights "would negatively impact them emotionally . . . ." Thus, he asked the court to "take a long-term view of the situation for the children."

Counsel for father joined in arguing both exceptions but focused on the parental-benefit exception. He pointed out that father had maintained consistent contact with the children since the case began in 2014. He did not argue that visitation had not been meaningful. To the contrary, visits had gone well until reunification services were reinstated. At that point, everything "went south." Thus, counsel argued the "real issue" was detriment. Father's relationship with his own father—the legal guardian—was "toxic" and "cannot be fixed." If parental rights were terminated, therefore, the legal guardians would not allow the parents to see the children.

The Department argued there was no evidence of a beneficial relationship between the children and the parents and no evidence that terminating parental rights would be detrimental to the children. Counsel explained: "The kids have been with the grandparents for almost their entire life, and the kids want to stay with their grandparents. They see their grandparents as their parents, and they see their biological parents as strangers."

Children's counsel joined with the Department's request to terminate parental rights. She argued "there is no positive relationship or beneficial relationship between [the children] and the parents. The evidence is overwhelming regarding how [the children] feel regarding their interactions with their parents." Daughter's "anxiety level was so high prior to visits that [her]

11

psychiatrist was considering prescribing medication to be given as needed . . . ." The visits got progressively worse because of the children's "constant fear that they will be returned to their parents." In short, the children wanted to be adopted; they did not want the visits to continue.

The court found mother and father had not proven the sibling exception. As to the parental-benefit exception, based on the factors in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court held that the parents had satisfied the first prong by maintaining regular contact and visitation. The court then looked at the nature of the relationship between the children and the parents, which it concluded "for the most part, has not been positive." Although there had been moments in which the children had opened up, such moments had been "few and far between." And "even then, nothing about the interaction in the last year-and-a-half that there has been an effort to really form and create and nurture the relationship, nothing has been shown to be effective in actually creating a substantial positive emotional attachment from the children to the parents." Because it could not find that a substantial, positive emotional attachment existed, the court could not find a benefit in continuing the relationship under the second prong of *Caden C.* It also concluded that, to the extent the court might be wrong on that point, even if a beneficial relationship existed, severing it would not be detrimental to the children, and any benefit of preserving it did not outweigh the benefits of adoption.

Mother and father filed timely notices of appeal.

### *DISCUSSION*

Mother and father argue the court erred when it declined to apply the parental-benefit exception to adoption. They contend

that although they were afforded regular visits, they were denied *meaningful* visitation with their children, which made it impossible for them to establish a relationship and prove the parental-benefit exception. Accordingly, the juvenile court violated their due process rights when it terminated parental rights.[4] The Department argues the parents have forfeited this contention by failing to object on this basis below. We agree with the Department.

## 1.    *The Parental-benefit Exception*

The purpose of section 366.26 proceedings is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) In cases in which the juvenile court terminates reunification services, adoption is the Legislature's preferred permanent plan for the child. (§ 366.26, subd. (b)(1); see *In re Celine R.* (2003) 31 Cal.4th 45, 53.) If the court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can

---

[4]    Mother also raises a half-dozen other arguments in which she appears to assert that the court erred by not returning the children to her custody at the section 366.26 hearing. Those assertions are not germane to this appeal. "Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Mother also argues the juvenile court should have held the legal guardians in contempt for obstructing the reunification process. Mother did not ask the trial court for such an order; on appeal, she has not developed the point with cogent legal argument or citation to authority. (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52; Cal. Rules of Court, rule 8.204(a)(1)(B).) As such, we do not address mother's remaining claims.

establish one of the section 366.26 exceptions to adoption. (*In re Celine R.*, at p. 53; see also § 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at p. 625.)

Under the parental-benefit exception to adoption, the parent must "establish, by a preponderance of the evidence," "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629, 631.) "What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Ibid.*)

The first element is straightforward. For the second element, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) As to the last element, "[w]hat courts need to determine … is how the child would be affected by losing the parental relationship— in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

When assessing whether the parental-benefit exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would

14

confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Essentially, "the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child."  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

We review the juvenile court's findings on the first two elements—regular visitation and whether the child would benefit from continuing the relationship—for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)  For the third element, we use a hybrid standard:  We review factual determinations for substantial evidence but review the weighing of relative harms and benefits of terminating parental rights for abuse of discretion.  (*Ibid.*)

## 2.    *The parents have forfeited their due process claim.*

Both parents fail to address the second and third prongs of the parental-benefit exception, implicitly conceding they cannot demonstrate error.  They contend, however, that they cannot meet this standard because the juvenile court did not afford them meaningful visitation with their children.[5]  The Department asserts, and we agree, that mother and father have forfeited this

---

[5]    No party has argued that our previous opinion resolved the merits of this claim adversely to parents.  Thus, we do not consider whether the prior opinion constitutes law of the case on that point.

15

issue by failing to raise it below.  Accordingly, although we acknowledge, as did the juvenile court, the parents' serious efforts to regain custody of their children, we conclude neither parent has established that the court erred.

"A reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court.  [Citation.]  The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*S.B.*).)  Dependency matters are not exempt from the forfeiture rule.  (*Ibid.*)  Here, despite ample opportunity to do so, mother and father did not object that their visits with the children were insufficiently meaningful.  If they had argued the point, the juvenile court might have been in a position to further modify the visitation orders.

On August 13, 2021, in response to objections from mother, the court ordered the legal guardians to transport the children to visits and directed the Department to facilitate family counseling between the parents and legal guardians.  At a progress hearing three weeks later, neither parent objected that those visits had not been meaningful.  Nor did the parents object at any of the next four hearings.  Both parents then failed to object to the quality of their visits when the court terminated reunification services.  Between termination of reunification services and termination of parental rights, the parents appeared in court another seven times.  Neither mother nor father objected to the quality of the visits at any of those hearings.

The juvenile court terminated parental rights on December 9, 2022.  That hearing was the 15th time the parents had appeared in court since mother's visitation-related walk-on

16

request more than a year earlier.  Yet, again, the parents did not object that they had not been afforded constitutionally-adequate visitation with their children.

Father nevertheless asks us to reach the merits of his claim.[6]  Although we acknowledge application of the forfeiture doctrine is not automatic, the Supreme Court instructs us to exercise our discretion to excuse forfeiture rarely and to do so only in cases presenting important legal issues.  (*S.B.*, *supra*, 32 Cal.4th at p. 1293.)  In dependency cases in particular, our "discretion must be exercised with special care . . . ." (*Ibid*.)  Certainly, the right to care for one's children is one of the most fundamental constitutional rights.  (*Troxel v. Granville* (2000) 530 U.S. 57, 66.)  But precisely because that right is so critical, if mother and father believed the juvenile court could do more to ensure the quality of their visits, it was incumbent on them to ask the court for help, not maintain silence for 16 months.  There is no indication in the record before us that such a request would have been futile—and father does not claim otherwise.  To the contrary, the court was thoughtful and engaged throughout this case.  As such, any necessary intervention should have been sought below.  We cannot undo the passage of time.

/ / /

/ / /

---

[6]     Mother did not file a reply brief and has not addressed the Department's argument on this point.

### *DISPOSITION*

The orders terminating parental rights are affirmed.


RUBIN, P. J.

WE CONCUR:


BAKER, J.


KIM, J.